UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE STANTON

08 CV 00855

|  |  |
|---|---|
| ————————————————————X | Civil Action No. |
| JEROME BIRN, Derivatively on Behalf of THE BEAR STEARNS COMPANIES, INC., | |
| Plaintiff, | |
| vs. | |
| JAMES E. CAYNE, WARREN J. SPECTOR, ALAN C. GREENBERG, ALAN D. SCHWARTZ, MICHAEL MINIKES, SAMUEL L. MOLINARO, JR., JEFFREY M. FARBER, CARL D. GLICKMAN, DONALD J. HARRINGTON, FREDERIC V. SALERNO, FRANK T. NICKELL, VINCENT TESE, PAUL A. NOVELLY, HENRY S. BIENEN, WESLEY S. WILLIAMS, JR. and MICHAEL GOLDSTEIN, | |
| Defendants, | |
| -and- | |
| THE BEAR STEARNS COMPANIES, INC., a Delaware corporation, | |
| Nominal Defendant. | |
| ————————————————————X | DEMAND FOR JURY TRIAL |

RECEIVED
JAN 24 2008
U.S.D.C. S.D. N.Y.
CASHIERS

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF
FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT
AND VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff, by his attorneys submits this Verified Shareholder Derivative Complaint against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.    This is a shareholder derivative action brought by a shareholder of The Bear Stearns Companies, Inc. ("Bear Stearns" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state and federal law, including breaches of fiduciary duties, waste of corporate assets, unjust enrichment and violations of the Securities Exchange Act of 1934 (the "Exchange Act") that occurred between July 2006 and the present (the "Relevant Period") and that have caused substantial monetary losses to Bear Stearns and other damages, such as to its reputation and goodwill.

2.    Bear Stearns provides a wide range of financial services. During the Relevant Period, Bear Stearns, under defendants' direction, recklessly acquired and maintained portfolios containing billions of dollars worth of subprime mortgage related assets, including collateralized debt obligations ("CDOs") backed by subprime mortgage related assets. These actions were reckless due to the impending subprime mortgage crisis and increasing delinquency rates among subprime borrowers. Despite these material adverse circumstances, defendants directed Bear Stearns to issue a series of improper statements that proclaimed record results.

3.    Beginning in July 2007, however, Bear Stearns began disclosing the true extent of its exposure to the widening subprime mortgage crisis. On July 17, 2007, Bear Stearns informed investors that it was closing two Company-managed hedge funds, whose assets consisted of subprime mortgage-related assets and CDOs. The collapse of these two funds represents over *$1.5 billion* in losses for investors. Currently, Bear Stearns is the subject of two lawsuits and governmental investigations in connection with the two funds.

4.    On September 20, 2007, Bear Stearns announced earnings for the third quarter of fiscal 2007 that were 61% lower than the same quarter in the prior year. Bear Stearns attributed those weak earnings to "extremely challenging" market conditions affecting its mortgage and credit business. More bad news followed on November 14, 2007 when Bear Stearns announced that it

would write-down its mortgage inventory by $1.2 billion in the fourth quarter. But that estimate proved to be grossly inaccurate.

5.    On December 20, 2007, Bear Stearns disclosed a *$1.9 billion* write-down of its mortgage inventory. This write-down lead to the Company's *first reported loss in its 84 year history*.

6.    While defendants were directing Bear Stearns to issue improper statements concerning its exposure to the subprime market crisis, they were also directing Bear Stearns to repurchase over $2.6 billion worth of its own shares at artificially inflated prices. Even worse, certain of the defendants sold their personally held shares while in possession of material non-public information for over $65 million in proceeds.

7.    As a result of the improper financial reporting, Bear Stearns' credibility with investors has diminished. During the Relevant Period, Bear Stearns' value declined from over $170 per share to less than $80 per share—a $10.3 billion market capitalization loss.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under the Exchange Act. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

9.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

10.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Bear Stearns maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the

transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Bear Stearns occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

11.    Plaintiff Jerome Birn is and was, at times relevant hereto, an owner and holder of Bear Stearns common stock.

12.    Nominal defendant Bear Stearns is a Delaware corporation with its principal executive offices located at 383 Madison Avenue, New York, New York. Bear Stearns provides a wide range of financial services.

13.    Defendant James E. Cayne ("Cayne") is Bear Stearns' Chairman of the Board and has been since June 2001. Cayne is also a Bear Stearns director and has been since 1985. Cayne was Bear Stearns' Chief Executive Officer ("CEO") from July 1993 to January 2008; a member of the Executive Committee from at least 2007 to January 2008; and President from at least 1991 to June 2001. Because of his positions, defendant Cayne knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Cayne participated in the issuance of improper statements, including the preparation of the improper press releases and Securities and Exchange Commission ("SEC") filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders. Defendant Cayne received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $250,000 | $17,070,746 | $14,838,829 | 35,788 | $6,154,315 |
| 2005 | $200,000 | $12,721,154 | $10,295,769 | 56,573 | $5,180,904 |

Defendant Cayne sold 46,415 shares of Bear Stearns stock for $7,645,478.80 in proceeds while in possession of material non-public information.

14.    Defendant Warren J. Spector ("Spector") was Bear Stearns' Senior Managing Director from August 2007 to December 2007. Spector was also Bear Stearns' President and Co-Chief

Operating Officer and a member of the Executive Committee from June 2001 to August 2007; a Bear Stearns director from 1999 to August 2007; an Executive Vice President from November 1992 to June 2001; and a director from 1987 to 1996. Because of his positions, defendant Spector knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Spector participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders. Defendant Spector received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $250,000 | $16,194,430 | $14,052,513 | 33,938 | $4,795,112 |
| 2005 | $200,000 | $12,072,654 | $9,744,544 | 53,650 | $4,919,625 |

Defendant Spector sold 116,255 shares of Bear Stearns stock for $19,066,373.04 in proceeds while in possession of material non-public information.

15.    Defendant Alan C. Greenberg ("Greenberg") is a Bear Stearns director and has been since 1985. Greenberg is also Chairman of Bear Stearns' Executive Committee and has been since at least 1997. Greenberg was Bear Stearns' Chairman of the Board from at least 1991 to June 2001 and CEO from 1985 to July 1993. Because of his positions, defendant Greenberg knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Greenberg participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders. Defendant Greenberg received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $250,000 | $9,000,000 | $7,612,500 | 18,789 | $3,057,772 |
| 2005 | $200,000 | $7,274,154 | $5,665,819 | 32,026 | $2,183,559 |

Defendant Greenberg sold 179,277 shares of Bear Stearns stock for $28,811,363.08 in proceeds while in possession of material non-public information.

16.     Defendant Alan D. Schwartz ("Schwartz") is Bear Stearns' CEO and has been since January 2008. Schwartz is also Bear Stearns' President and a member of the Executive Committee and has been since June 2001 and a director and has been since 1999. Schwartz was Bear Stearns' Co-Chief Operating Officer from June 2001 to January 2008; a director from 1987 to 1996; and Executive Vice President and Head of the Investment Banking Division from 1985 to June 2001. Because of his positions, defendant Schwartz knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Schwartz participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders. Defendant Schwartz received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $250,000 | $16,237,150 | $14,014,065 | 33,847 | $5,233,207 |
| 2005 | $200,000 | $12,072,654 | $9,744,544 | 53,650 | $4,487,164 |

Defendant Schwartz sold 23,333 shares of Bear Stearns stock for $3,823,221.76 in proceeds while in possession of material non-public information.

17.     Defendant Michael Minikes ("Minikes") is CEO of Bear, Stearns Securities Corp. and has been since January 2008. Minikes was also Bear Stearns' Treasurer from at least 2001 to January 2008. From 1980 to about 2001, Minikes held various positions with Bear Stearns and Bear, Stearns Securities Corp. Because of his position, defendant Minikes knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Minikes participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders. Defendant Minikes sold 20,569 shares of Bear Stearns stock for $3,370,694.98 in proceeds while in possession of material non-public information.

18.     Defendant Samuel L. Molinaro, Jr. ("Molinaro") is Bear Stearns' Chief Operating Officer and has been since August 2007. Molinaro is also Bear Stearns' Executive Vice President

and has been since December 2001 and Chief Financial Officer and has been since 1996. Because of his position, defendant Molinaro knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Molinaro participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders. Defendant Molinaro received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $250,000 | $12,967,500 | $10,971,750 | 26,691 | $2,364,500 |
| 2005 | $200,000 | $8,052,654 | $6,327,544 | 35,534 | $1,524,739 |

Defendant Molinaro sold 10,826 shares of Bear Stearns stock for $1,762,937.24 in proceeds while in possession of material non-public information.

19.    Defendant Jeffrey M. Farber ("Farber") is Bear Stearns' Senior Vice President – Finance and has been since March 2007. Farber is also Bear Stearns' Controller and Principal Accounting Officer and has been since January 2004. Farber was Bear Stearns' Assistant Controller from May 2000 to January 2004. Because of his position, defendant Farber knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Farber participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders. Defendant Farber sold 1,881 shares of Bear Stearns stock for $283,233.08 in proceeds while in possession of material non-public information.

20.    Defendant Carl D. Glickman ("Glickman") is a Bear Stearns director and has been since 1985. Glickman is also Chairman of Bear Stearns' Compensation Committee and has been since at least 2005 and a member of the Audit Committee and has been since at least 2005. Because of his positions, defendant Glickman knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Glickman participated in the issuance of

-6-

improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders. Defendant Glickman sold 3,427 shares of Bear Stearns stock for $317,066.04 in proceeds while in possession of material non-public information.

21.    Defendant Donald J. Harrington ("Harrington") is a Bear Stearns director and has been since 1993. Harrington is also a member of Bear Stearns' Compensation Committee and has been since at least 2005. Because of his positions, defendant Harrington knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Harrington participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders. Defendant Harrington sold 1,000 shares of Bear Stearns stock for $171,450 in proceeds while in possession of material non-public information.

22.    Defendant Frederic V. Salerno ("Salerno") is a Bear Stearns director and has been since 1992. Salerno is also a member of Bear Stearns' Finance and Risk Committee and has been since January 2007 and a member of the Audit Committee and has been since at least 2005. Because of his positions, defendant Salerno knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Salerno participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders.

23.    Defendant Frank T. Nickell ("Nickell") is a Bear Stearns director and has been since 1993. Nickell is also a member of Bear Stearns' Finance and Risk Committee and has been since at 2007 and a member of the Compensation Committee and has been since at least 2005. Because of his positions, defendant Nickell knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Nickell participated in the issuance of improper statements,

including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders.

24.    Defendant Vincent Tese ("Tese") is a Bear Stearns director and has been since 1994. Tese is also Chairman of Bear Stearns' Audit Committee and has been since at least 2005; a member of Bear Stearns' Finance and Risk Committee and has been since January 2007; and a member of the Compensation Committee and has been since at least 2005. Because of his positions, defendant Tese knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Tese participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders.

25.    Defendant Paul A. Novelly ("Novelly") is a Bear Stearns director and has been since 2002. Novelly is also Chairman of Bear Stearns' Finance and Risk Committee and has been since January 2007 and a member of the Audit Committee and has been since at least 2005. Because of his positions, defendant Novelly knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Novelly participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders.

26.    Defendant Henry S. Bienen ("Bienen") is a Bear Stearns director and has been since 2004. Bienen is also a member of Bear Stearns' Audit Committee and has been since at least 2005. Because of his positions, defendant Bienen knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Bienen participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders.

27.    Defendant Wesley S. Williams, Jr. ("Williams") is a Bear Stearns director and has been since 2004. Williams is also a member of Bear Stearns' Audit Committee and has been since at

-8-

least 2005. Because of his positions, defendant Williams knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Williams participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders.

28.    Defendant Michael Goldstein ("Goldstein") is a Bear Stearns director and has been since January 2007. Goldstein is also a member of Bear Stearns' Audit Committee and has been since January 2007.Because of his positions, defendant Goldstein knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Goldstein participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders.

29.    The defendants identified in ¶¶13-16, 20-28 are referred to herein as the "Director Defendants." The defendants identified in ¶¶13-19 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶13-21 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants and the Officer Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

30.    By reason of their positions as officers, directors and/or fiduciaries of Bear Stearns and because of their ability to control the business and corporate affairs of Bear Stearns, the Individual Defendants owed Bear Stearns and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Bear Stearns in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Bear Stearns and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

31.     Each director and officer of the Company owes to Bear Stearns and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

32.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Bear Stearns, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with Bear Stearns, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Bear Stearns.

33.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Bear Stearns, and was at all times acting within the course and scope of such agency.

34.     To discharge their duties, the officers and directors of Bear Stearns were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Bear Stearns were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)    remain informed as to how Bear Stearns conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)    ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable laws, rules and regulations.

35.    Each Individual Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Bear Stearns, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period have been ratified by the remaining Individual Defendants who collectively comprised all of Bear Stearns' Board during the Relevant Period.

36.    The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

37.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

38.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its business prospects and results; (ii) enhance the Individual Defendants' executive and directorial positions at Bear Stearns and the profits, power and prestige that the Individual Defendants enjoyed as a result of holding these positions; (iii) allow the Individual Defendants to sell over $65 million of their personally held shares; and (iv) deceive the investing public, including shareholders of Bear Stearns, regarding the Individual Defendants' management of Bear Stearns' operations, the Company's financial health and stability, and its future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

39.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct during the Relevant Period.  During this time, the Individual Defendants caused the Company to conceal the true fact that Bear Stearns was misrepresenting its business prospects.

40.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' breaches of fiduciary duty, waste of corporate assets and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition and future business prospects.

41.    The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently release improper statements.  Because the actions described herein occurred under the authority of the

Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

42.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## THE SUBPRIME MARKET CRISIS

43.    Bear Stearns provides a wide range of financial services including commercial and residential mortgage loans. During times relevant hereto, the Individual Defendants directed Bear Stearns to provide those services in connection with mortgages made to subprime borrowers. A subprime borrower is someone with a low credit score, higher debt-to-income ratio, or other characteristics associated with a high probability of default relative to "prime" or less-risky borrowers.

44.    In an environment of appreciating home prices and low interest rates, subprime borrowers are typically able to stay current due to the rising equity in their property. But in an environment of depreciating home prices, increasing default rates are the norm. This is exactly what has been occurring since at least mid-2006.

45.    In fact, as early as 2005, bankers and economists alike were expressing concern over the rising delinquency rates in nontraditional mortgages such as subprime mortgages, especially because the risk of delinquency would be heightened by a downturn in the housing market. For example, on August 24, 2005, *USA Today* reported that economists and bankers were "getting nervous about the wide use of higher-risk financing, such as … subprime mortgages for low-income home buyers." As chief economist Doug Duncan of the Mortgage Bankers Association stated in the article, easy financing helps people buy homes, but also raises foreclosure risks.

46.    Similarly, at the CPR and CDR's Prepayment and Mortgage Credit Modeling & Strategy Conference in October 2005, Freddie Mac Chief Economist Frank Nothaft stated that

subprime delinquency rates remained worrisome, with subprime delinquencies as much as eight to nine times higher than prime loans.

47.     In a December 26, 2005 *Business Week* article, JPMorgan Chase & Co. estimated that risky subprime loans made up close to 9% of mortgage debt—large enough to make a downturn worse if those loans began to fail in large numbers.

48.     Governor Susan Schmidt Bies, a member of the Federal Reserve Board, gave a speech at the Financial Services Institute on February 2, 2006. In her speech, Bies noted that the Federal Reserve and other banking supervisors were concerned that then-current risk-management techniques did not fully address the level of risk in nontraditional mortgages such as subprime mortgages—a risk that would be heightened by a downturn in the housing market. Bies also stated that lenders were increasingly combining nontraditional mortgage loans with weaker mitigating controls on credit exposures.

49.     These concerns rang true in 2006, as a subprime mortgage crisis erupted. During the first stage of this crisis, several prominent subprime lenders including New Century Financial Corporation declared bankruptcy as liquidity dried up and the lenders found themselves unable to continue originating loans. Other subprime lenders, such as Accredited Home Lenders Holding Company, staged fire sales in a desperate attempt to raise cash to stay afloat.

50.     Throughout the Relevant Period, the Individual Defendants recklessly directed Bear Stearns to acquire and maintain a mortgage portfolio containing billions of dollars worth of subprime mortgage related assets. Moreover, the Individual Defendants caused or allowed Bear Stearns to improperly report its exposure to losses on those assets as alleged herein.

## IMPROPER STATEMENTS

51.     The Individual Defendants by their fiduciary duties of care, good faith and loyalty owe to Bear Stearns a duty to insure that the Company's financial reporting fairly represents the operations and financial condition of the Company. In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material, non-public information that should be either disclosed or omitted from the Company's public statements.

-14-

52. This material, non-public information principally included Bear Stearns' exposure to the subprime lending market crisis. Further, defendants Bienen, Glickman, Goldstein, Novelly, Salerno, Tese and Williams were as members of the Audit Committee had a special duty to know and understand this material information as set out in the Audit Committee's charter, which provides that the Audit Committee is responsible for reviewing and discussing: (i) earnings press releases; (ii) financial information and earnings guidance provided to analysts and rating agencies; and (iii) Bear Stearns' policies regarding risk assessment and risk management. Defendants Nickell, Novelly, Salerno and Tese, as members of the Finance and Risk Committee, also had a special duty to know and understand this material information as set out in the Finance and Risk Committee's charter which provides that the Finance and Risk Committee is responsible for: (i) reviewing and discussing with the Audit Committee Bear Stearns' policies and procedures regarding risk assessment and risk management of the Company's trading and investment risks; (ii) reviewing and discussing the risk measures and risk models utilized by the Company in evaluating and limiting financial risks; and (iii) reviewing and discussing with the Audit Committee significant risk exposures and trends.

53. The Officer Defendants had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports. Moreover, the Director Defendants as directors of Bear Stearns had ample opportunity to discuss this material information with management and fellow directors at any of the Board meetings that occurred during the Relevant Period, as well as at meetings of committees of the Board. Despite these duties, the Individual Defendants negligently, recklessly and/or intentionally caused or allowed, by their actions or inactions, the following improper statements to be disseminated by Bear Stearns to the investing public and the Company's shareholders during the Relevant Period.

54. On June 15, 2006, the Individual Defendants caused or allowed Bear Stearns to issue a press release announcing it fiscal second quarter 2006 earnings. Bear Stearns reported earnings of $539 million. Also according to the press release, Bear Stearns' "mortgage franchise retained its number one industry ranking for the first half of fiscal 2006." Defendant Cayne commented that "[t]he first half of 2006 has proved to be [Bear Stearns'] best ever." In particular, the press release provided as follows:

-15 -

The Bear Stearns Companies Inc. today reported earnings per share (diluted) of $3.72 for the second quarter ended May 31, 2006, up 78% from $2.09 per share for the second quarter of 2005. Net income for the second quarter of 2006 was $539 million, up 81% from $298 million for the second quarter of 2005. Net revenues for the 2006 second quarter were a record $2.5 billion, up 33% from $1.9 billion for the 2005 second quarter. The annualized return on common stockholders' equity for the second quarter of 2006 was 20.1%, and 18.7% for the trailing 12-month period ended May 31, 2006.

"We are very pleased to report our third consecutive quarter of record setting results. The first half of 2006 has proven to be our best ever," said James E. Cayne, chairman and chief executive officer. "Our success in increasing the depth and breadth of our business both domestically and internationally has fueled our enthusiasm and appetite for further growth. We will continue to explore ways to expand our business through launching new products, gaining market share in existing product areas, and increasing our presence internationally."

A brief discussion of the firm's business segments follows:

CAPITAL MARKETS

Capital Markets net revenues for the second quarter of 2006 were $2.0 billion, up 40% from $1.4 billion for the quarter ended May 31, 2005.

- Institutional Equities net revenues were a record $554 million, up 42% from $390 million for the second quarter of 2005. Higher customer activity levels and favorable market conditions across the equity franchise drove these record results. Equity derivatives and international sales and trading produced record net revenues this quarter.

- Fixed Income net revenues were a record $1.2 billion, up 45% from $808 million in the second quarter of 2005. The mortgage franchise retained its number one industry ranking for the first half of fiscal 2006. Securitization and trading volumes remained high, and origination flow from the vertical integration of the mortgage platform rose producing record net revenues. Interest rate derivatives and foreign exchange produced record net revenues contributing to a record quarter in the interest rate products area. Robust customer activity levels led to record net revenues in both the distressed debt and leverage finance areas driving record net revenues in the credit businesses this quarter.

- Investment Banking net revenues were $278 million, up 20% from the $232 million in the prior year quarter. Merger and acquisition advisory fees increased significantly this quarter as a number of previously announced transactions were completed during the quarter. Underwriting net revenues were up as equity new issuance volumes increased compared with the year-ago quarter. These gains were partially offset by decreases in merchant banking net revenues compared with the prior year quarter.

55.     On September 14, 2006, the Individual Defendants caused or allowed Bear Stearns to

issue a press release announcing its earnings for its fiscal third quarter 2006. Bear Stearns reported

earnings of $438 million. According to the press release, "[m]ortgage-related revenues increased

from the prior year period as customer activity and gains in market share more than offset declining industry volumes. Bear Stearns continues to be ranked as the number one underwriter of U.S. Mortgage backed securities for the third quarter ...." Defendant Cayne commented that "Bear Stearns produced excellent results for the third quarter and record results for the first nine months of 2006." In particular, the press release provided as follows:

> The Bear Stearns Companies Inc. today reported earnings per share (diluted) of $3.02 for the third quarter ended August 31, 2006, up 12% from $2.69 per share for the third quarter of 2005. Net income for the third quarter of 2006 was $438 million, up 16% from $378 million for the third quarter of 2005. Net revenues were $2.1 billion for the third quarter, up 17% from $1.8 billion for the third quarter of 2005. The annualized return on common stockholders' equity for the third quarter of 2006 was 15.8%, and 18.4% for the trailing 12-month period ended August 31, 2006.
>
> "Bear Stearns produced excellent results for the third quarter and record results for the first nine months of 2006," said James E. Cayne, chairman and chief executive officer. "Our franchise continues to grow as we selectively hire talented professionals worldwide. We are seizing opportunities in the marketplace to both expand our existing core businesses and enter new areas where we can profitably develop our market presence. I am proud of our success and I am enthusiastic about our future."
>
> A brief discussion of the firm's business segments follows:
>
> CAPITAL MARKETS
>
> Net revenues for the Capital Markets segment were $1.5 billion for the quarter ended August 31, 2006, up 13% from $1.4 billion for the third quarter of 2005.
>
> - Institutional Equities net revenues were $436 million for the third quarter of 2006, a 31% increase from $334 million for the comparable prior-year quarter. Strong results from domestic and international sales and trading, structured equity products and energy/commodity activities all contributed to this robust performance.
>
> - Fixed Income net revenues were $878 million for the third quarter 2006, up 19% from $739 million reported for the quarter ended August 31, 2005. Mortgage-related revenues increased from the prior year period as customer activity and gains in market share more than offset declining industry volumes. Bear Stearns continues to be ranked as the number one underwriter of U.S. Mortgage-backed securities for the third quarter as well as for the nine months ended August 31, 2006. The credit businesses remained very strong, led by the leveraged finance and credit trading areas.
>
> - Investment Banking net revenues were $232 million for the quarter ended August 31, 2006, down 23% from $300 million for the year-ago third quarter. Excluding merchant banking, Investment Banking net revenues increased 8% due to increased merger and acquisition advisory fees as a number of previously announced transactions were completed during the quarter. Partially offsetting the increase in

merger and acquisition advisory fees were reduced underwriting net revenues reflecting lower industry activity levels as compared with the prior-year quarter.

56.    On December 14, 2006, the Individual Defendants caused or allowed Bear Stearns to issue a press release announcing its fiscal fourth quarter and full year 2006 earnings. Bear Stearns reported earnings of $563 million for the quarter and $2.1 billion for the year. According to the press release, "[m]ortgage revenues increased reflecting higher volumes and increased commercial-mortgage securitization activity." Defendant Cayne commented that "[w]e are pleased to announce Bear Stearns' fifth consecutive year of record net income and earnings per share." In particular, the press release provided as follows:

The Bear Stearns Companies Inc. today reported earnings per share (diluted) of $4.00 for the fourth quarter ended November 30, 2006, up 38% from $2.90 per share for the fourth quarter of 2005. Net income for the fourth quarter of 2006 was $563 million, up 38% from $407 million for the fourth quarter of 2005. Net revenues for the 2006 fourth quarter were $2.4 billion, up 28% from $1.9 billion for the 2005 fourth quarter. The annualized return on common stockholders' equity for the fourth quarter of 2006 was 20.5%.

For the fiscal year ended November 30, 2006, earnings per share (diluted) were a record $14.27, up 38% from $10.31 for fiscal 2005. Net income for the fiscal year 2006 was $2.1 billion, up 40% from the $1.5 billion earned in the twelve-month period ended November 30, 2005. Net revenues for fiscal year 2006 were $9.2 billion, an increase of 25% from $7.4 billion in the prior fiscal year. The after-tax return on common stockholders' equity was 19.1% for fiscal 2006.

"We are pleased to announce Bear Stearns' fifth consecutive year of record net income and earnings per share," said James E. Cayne, chairman and chief executive officer. "Our continued success is a testament to our unwavering focus on serving our clients with excellence; attracting and retaining talented professionals and profitably expanding our broad and diverse franchise. I look forward to 2007 and our continued expansion both internationally and domestically."

A brief discussion of the firm's business segments follows:

CAPITAL MARKETS

Fourth Quarter

Net revenues in Capital Markets, which includes Institutional Equities, Fixed Income and Investment Banking, were $1.8 billion for the fourth quarter of 2006, up 26% from $1.4 billion for the fourth quarter ended November 30, 2005.

- Institutional Equities net revenues were $397 million, up 7% from $373 million for the fourth quarter of 2005. Record results from risk arbitrage and continued strong results from equity derivatives and international sales and trading contributed to this strong performance.

- Fixed Income net revenues were $1.1 billion, up 25% from $839 million in the fourth quarter of 2005. The credit business produced

record results led by the credit derivatives, distressed debt and leveraged finance areas. Mortgage revenues increased reflecting higher volumes and increased commercial-mortgage securitization activity.

- Investment Banking net revenues were $364 million in the fourth quarter of 2006, up 58% from the $231 million in the comparable prior year period. This increase reflects fees from higher underwriting and merger and acquisition transaction volumes.

57.    On March 15, 2007, the Individual Defendants caused or allowed the Company to issue a press release announcing its fiscal first quarter 2007 earnings. Bear Stearns reported earnings of $554 million. Defendant Cayne commented in the press release that "[w]e are pleased with this excellent performance, revenues for the first quarter were up for every business segment." In particular, the press release provided as follows:

The Bear Stearns Companies Inc. today reported earnings per share (diluted) of $3.82 for the first quarter ended February 28, 2007, up 8% from $3.54 per share for the first quarter of 2006. Net income for the first quarter of 2007 was $554 million, up 8% from $514 million for the first quarter of 2006. Net revenues were $2.5 billion for the 2007 first quarter, up 14% from $2.2 billion in the 2006 first quarter. The annualized return on common stockholders' equity was 18.3% for the first quarter of 2007 and 18.6% for the trailing 12-month period ended February 28, 2007.

"We are pleased with this excellent performance, revenues for the first quarter were up for every business segment," said James E. Cayne, chairman and chief executive officer of The Bear Stearns Companies Inc. "Growing the company remains a core focus as we continue to invest in our domestic and international franchises with successful results."

A brief discussion of the firm's business segments follows:

CAPITAL MARKETS

Capital Markets net revenues for the first quarter of 2007 were $2.0 billion, up 15% from $1.7 billion in the first quarter of 2006.

- Institutional Equities net revenues were $513 million, up 3% from $500 million for the first quarter of 2006. Equity derivatives delivered a record quarter with improved market conditions leading to increased customer activity. International sales and trading revenues increased in the first quarter compared with the year-ago quarter, and risk arbitrage net revenues rose reflecting the high level of activity in announced merger and acquisition transactions.

- Fixed Income net revenues were $1.1 billion, up 27% from $907 million in the year-ago quarter. The credit business produced record results led by the credit derivatives and distressed debt areas. The interest rate area also produced strong results reflecting increased volatility and higher customer volume. Residential mortgage-related revenues decreased from the prior year period, reflecting weakness in the U.S. residential mortgage-backed securities market.

- Investment Banking net revenues were $303 million in the first quarter of 2007, up 3% from $296 million in the comparable prior-year period. Equity underwriting and merger and acquisition activity remained strong in the first quarter of 2007. However, merchant banking revenues were lower than in the prior year quarter. Excluding merchant banking revenues, Investment Banking net revenues increased 20% compared with the first quarter of 2006.

58.    On June 14, 2007, the Individual Defendants caused or allowed Bear Stearns to issue a press release announcing its earnings for its fiscal second quarter 2007 earnings. Bear Stearns announced earnings of $362 million. Defendant Cayne commented that "[t]he diversity of our franchise is clearly demonstrated in the record net revenues generated this quarter." In particular, the press release provided as follows:

The Bear Stearns Companies Inc. today reported earnings per share (diluted), after a non-cash charge, of $2.52 for the second quarter ended May 31, 2007, down 32% from $3.72 per share for the second quarter of 2006. Second quarter results include the effect of a $227 million or $0.88 per share (diluted) non-cash charge related to the write-down of intangible assets, representing goodwill and specialist rights of Bear Wagner Specialists. Earnings per share (diluted) excluding this charge would have been $3.40 for the 2007 second quarter. Net income for the second quarter of 2007, after the non-cash charge, was $362 million. Net income excluding the non-cash charge would have been $486 million, down 10% from $539 million for the second quarter of 2006. Net revenues for the 2007 second quarter were a record $2.512 billion, up from the previous record of $2.499 billion reported for the 2006 second quarter. The annualized return on common stockholders' equity for the second quarter of 2007 was 11.6%, and 16.4% for the trailing 12-month period ended May 31, 2007. Excluding the non-cash charge, annualized return on common stockholders' equity for the second quarter of 2007 would have been 15.6%, and 17.5% for the trailing 12-month period ended May 31, 2007.

"The diversity of our franchise is clearly demonstrated in the record net revenues generated this quarter," said James E. Cayne, chairman and chief executive officer of The Bear Stearns Companies Inc. "The Global Clearing Services and Wealth Management segments reported record performance while results were also very strong from debt and equity underwriting, equity derivatives and leveraged finance. Internationally, we continue to grow aggressively, hiring talented people, broadening our product platform and reaching new clients in multiple geographies."

A brief discussion of the firm's business segments follows:

CAPITAL MARKETS

Capital Markets net revenues for the second quarter of 2007 were $1.9 billion, down 10% from a record high of $2.1 billion for the quarter ended May 31, 2006.

- Institutional Equities net revenues were $543 million, a slight decline from $560 million for the second quarter of 2006. Record revenues in equity derivatives and risk arbitrage, as well as continued strong results from international sales and trading, drove second quarter 2007 performance. The 2006 second quarter included gains recognized from the initial public offering of NYSE Group, without

these gains net revenues for the 2007 quarter would have increased significantly as compared with the prior year period.

- Fixed Income net revenues were $962 million for the 2007 second quarter, down 21% from record revenues of $1.2 billion recorded in the second quarter of 2006. The credit business produced strong results led by credit derivatives and the record net revenues in leveraged finance. Mortgage-related revenues reflected both industry-wide declines in residential mortgage origination and securitization volumes and challenging market conditions in the sub-prime and Alt-A mortgage sectors.

- Investment Banking net revenues were $357 million, up 28% from the $278 million in the 2006 second quarter. Underwriting net revenues increased, driven by active corporate and financial sponsor clients. Merger and acquisition advisory fees were strong, reflecting continued robust market conditions and the completion of a number of marquee transactions.

### THE TRUTH BEGINS TO BE REVEALED

59.     On July 17, 2007, defendant Cayne informed the investors of two hedge funds managed by Bear Stearns that there "is effectively no value left" in either fund. The collapse of these two funds—whose assets consisted of subprime mortgage-related assets including CDOs—represents over *$1.5 billion* in losses for investors. Bear Stearns' value declined approximately 20% in the wake of this disclosure.

60.     On August 5, 2007, defendant Spector resigned from his positions as President and Co-Chief Operating Officer and as a Bear Stearns director.

61.     On September 20, 2007, the Individual Defendants caused or allowed Bear Stearns to issue a press release announcing its third fiscal quarter 2007 earnings. Bear Stearns reported disappointing earnings of $171.3 million, down 61% from the same quarter in fiscal 2006. According to the press release, "[m]arket conditions in both the mortgage and credit business were extremely challenging this quarter." In particular, the press release provided as follows:

The Bear Stearns Companies Inc. today reported earnings per share (diluted) of $1.16 for the third quarter ended August 31, 2007, down 62% from $3.02 per share for the third quarter of 2006. Net income for the third quarter of 2007 was $171.3 million, down 61% from $438 million for the third quarter of 2006. Net revenues were $1.3 billion for the third quarter, down 38% from $2.1 billion for the third quarter of 2006. The annualized return on common stockholders' equity for the third quarter of 2007 was 5.3%, and 13.7% for the 12-month period ended August 31, 2007. Third quarter results include approximately $200 million in losses and expenses related to the BSAM High-Grade hedge funds.

"The third quarter was characterized by extremely difficult securitization markets and high volatility levels across asset classes. While our fixed income results

clearly reflect these market conditions, we reported solid revenues in Investment Banking and record revenues in Global Equities and Global Clearing Services." said James E. Cayne, chairman and chief executive officer. "I am confident in the underlying strength of our business and proud of the effort and determination displayed by our employees during these challenging times."

A brief discussion of the firm's business segments follows:

CAPITAL MARKETS

Net revenues for the Capital Markets segment were $1.0 billion for the quarter ended August 31, 2007, down 36% from $1.6 billion for the third quarter of 2006.

- Institutional Equities net revenues were a record $719 million for the 2007 third quarter, a 53% increase from $471 million for the comparable prior-year quarter. This strong performance was driven by record results in structured equity products and robust international sales and trading net revenues.

- Fixed Income net revenues were $118 million for the 2007 third quarter, down 88% from $945 million reported for the quarter ended August 31, 2006. Market conditions in both the mortgage and credit businesses were extremely challenging this quarter. A general re-pricing of risk in the market led to significant reductions in both mortgage and credit-related revenues as volumes decreased while asset values declined.

- Investment Banking net revenues were $211 million for the quarter ended August 31, 2007, down 9% from $232 million for the year-ago third quarter. Merger and acquisition advisory fees increased as a number of announced transactions were completed during the quarter. Total underwriting net revenues were flat as increased equity underwriting revenues were offset by lower fixed income underwriting revenues. Merchant Banking revenues decreased during the quarter due to changes in mark-to-market values of several portfolio companies.

62.    On November 14, 2007, Bear Stearns disclosed in a Form 8-K filing that it expected

to write-down its mortgage inventory, including its CDO warehouse portfolio, by approximately $1.2

billion. In particular, Bear Stearns' Form 8-K disclosed the following:

On November 14, 2007, Samuel L. Molinaro, Jr., Executive Vice President, Chief Financial Officer and Chief Operating Officer of The Bear Stearns Companies Inc. (the "Company"), made a presentation at the Merrill Lynch Banking and Financial Services Investor Conference. Mr. Molinaro's participation in the conference was previously announced and the conference was available to the public via webcast. During the presentation, Mr. Molinaro provided an update on the Company's collateralized debt obligations (or "CDO's") and subprime related exposures. A slide used by Mr. Molinaro for this portion of the presentation is filed herewith as Exhibit 99.1 and incorporated herein by reference.

As of August 31, 2007, the Company had total ABS CDO related exposures of approximately $2 billion, which consisted of $963 million of AAA super senior, $165 million below AAA and $944 million of CDO Warehouse. These positions

have been materially reduced through November 9, 2007. The CDO Warehouse exposure as of August 31, 2007 has essentially been liquidated or converted into CDO's. The Company's overall CDO position as of November 9, 2007 was $884 million, down from approximately $2 billion as of August 31, 2007. During the period between August 31, 2007 and November 9, 2007, the Company significantly increased its short subprime exposures reducing the August 31, 2007 net exposure of approximately $1 billion to a negative $52 million net exposure as of November 9, 2007.

As a result of the extremely challenging environment, the Company has gone through an exhaustive process of revaluing the mortgage and CDO portfolios. As a result, the Company will be taking a net write-down of approximately $1.2 billion on these positions and others in our mortgage inventory. Net of tax, this write down is approximately $700 million. The vast majority of these losses are attributable to write downs on the CDO and CDO warehouse portfolio. Consequently, the Company anticipates having a loss for the 4th quarter of 2007. The Company has no off-balance-sheet exposures to CDO or subprime collateral held by conduits or other entities including Structured Investment Vehicles (SIVs).

## THE TRUTH IS FULLY REVEALED

63.    Then, on December 20, 2007, Bear Stearns disclosed the full extent of its exposure to the subprime mortgage crisis. Specifically, Bear Stearns disclosed a net loss of $854 million—the Company's *first loss in over 84 years*. This loss stemmed from a $1.9 billion dollar write-down—substantially larger than its previously announced $1.2 billion write-down—of its mortgage related assets, including CDOs. Bear Stearns' fiscal fourth quarter and full year 2007 earnings press release provided as follows:

The Bear Stearns Companies Inc. reported results today for the fiscal year and the fourth quarter ended November 30, 2007. For the fiscal year the company reported $1.52 earnings per share (diluted), compared with $14.27 for fiscal 2006. Net income for the fiscal year was $233 million compared with $2.1 billion earned in fiscal year ended November 30, 2006. Net revenues for the 2007 fiscal year were $5.9 billion, compared with $9.2 billion in the prior fiscal year. The after-tax return on common stockholders' equity was 1.8% for fiscal 2007.

In early November the company announced that it anticipated write-downs of approximately $1.2 billion in mortgage inventory net of hedges. At November 30, total net inventory write-downs were $1.9 billion. These write-downs served to reduce fourth quarter earnings per share (diluted) by $8.21. Including these write-downs the company reported a loss for the fourth quarter ended November 30, 2007 of $6.90 per share1. For the comparable fourth quarter of 2006, the company reported earnings per share (diluted) of $4.00. The net loss for the fourth quarter of 2007 was $854 million as compared with net income of $563 million for the fourth quarter of 2006. Net revenues for the 2007 fourth quarter were a loss of $379 million down from revenues of $2.4 billion for the 2006 fourth quarter.

"We are obviously upset with our 2007 results, particularly in light of the fact that weakness in fixed income more than offset strong and, in some areas, record-setting performance in other businesses," said James E. Cayne, chairman and chief executive officer. "Our underlying fixed income franchise remains strong and we have taken steps to size the division to market conditions. We are taking appropriate

-23-

measures to position Bear Stearns for renewed profitability in 2008 by focusing our resources on the businesses with growth potential in the current environment, while streamlining our operations in areas with lower expected activity levels. We are confident that these efforts will ensure Bear Stearns remains a strong and profitable competitor in the global marketplace in the years to come."

"When Bear Stearns became a public company, consistent with our entrepreneurial roots and to ensure alignment of interests between management and shareholders, we designed our executive compensation programs to pay for performance. In a year in which we produced unacceptable results, the plans are working as they were designed -- and the members of the executive committee will not receive any bonuses for 2007."

\* \* \*

## CAPITAL MARKETS

Fourth Quarter

Net revenues in Capital Markets, which includes Institutional Equities, Fixed Income and Investment Banking, were a loss of $956 million in the fourth quarter of 2007, down from net revenues of $1.9 billion in the fourth quarter ended November 30, 2006.

- Institutional Equities net revenues were $384 million, down 11% from $430 million in the fourth quarter of 2006. Record results from international equity sales and trading and continued strong results from domestic equity sales drove this quarterly performance partially offset by reduced performance in structured equity products.

- Fixed Income net revenues were a loss of $1.5 billion, down from net revenues of $1.1 billion in the fourth quarter of 2006. The continued re-pricing of credit risk and the severe dislocation in the structured products market led to illiquidity in the fixed income markets, lower levels of client activity across the fixed income sector and a significant revaluation of mortgage inventory. Total write-downs were $1.9 billion in the quarter net of hedges.

- Investment Banking net revenues were $205 million in the fourth quarter of 2007, down 44% from the $364 million in the comparable prior-year period. This decrease reflects lower fees from fixed income underwriting which were partially offset by continued strong merger and acquisition activity levels.

## Full Year

Capital Markets net revenues were $3.9 billion in fiscal year 2007, a decrease of 46% from the $7.3 billion reported in 2006.

- Institutional Equities net revenues in the 2007 fiscal year were up 10% to a record $2.2 billion from $2.0 billion in fiscal 2006. International sales and trading, risk arbitrage and principal strategies all delivered record results.

- Fixed Income net revenues were $685 million in 2007, down from $4.2 billion in 2006. Results for 2007 were heavily influenced by the severe market conditions across the fixed income sector. More

broadly, the re-pricing of credit also led to significantly lower net revenue levels due to illiquidity in the markets as trading activity levels deteriorated across the spectrum of fixed income products.

- Investment Banking reported net revenues of $1.1 billion in fiscal 2007, down 8% from $1.2 billion in the prior fiscal year. Increases in equity underwriting and higher transaction volumes in advisory areas were more than offset by lower fixed income underwriting net revenues and merchant banking results.

64.    Also on December 20, 2007, FIC LP ("FIC"), a San Francisco partnership that had invested in the two hedge funds that had collapsed during July 2007, sued Bear Stearns over the Company's management of the funds. This suit followed in the footsteps of a similar suit that Barclays Bank PLC had filed against the Company on the day before. FIC is seeking class action status on behalf of other investors in the two funds. Moreover, the SEC and the U.S Attorney's office in Brooklyn are currently conducting criminal and civil investigations of the funds' collapse.

65.    On January 8, 2008, defendant Cayne resigned his position as CEO of the Company.

66.    On or about January 9, 2008, Bear Stearns announced that it was closing a third hedge fund that had invested in mortgage backed securities. The collapse of this fund represents hundreds of millions worth of additional losses to investors and could potentially trigger further lawsuits and investigations.

67.    During the fourth quarter, Bear Stearns cut 1,400 jobs or approximately 9% of its workforce. The Company incurred $100 million in severance costs in connection with the layoffs.

68.    In the wake of these devastating disclosures, during the Relevant Period, Bear Stearns' value declined from over $170 per share to less than $80 per share—a $10.3 billion market capitalization loss.

## REASONS THE STATEMENTS WERE IMPROPER

69.    Bear Stearns' Relevant Period statements failed to disclose and misrepresented the following material adverse facts, which the Individual Defendants knew, consciously disregarded, were reckless and grossly negligent in not knowing or should have known:

(a)    Bear Stearns was more exposed to the subprime market crisis than it had disclosed;

(b)    Bear Stearns' portfolio of billions in subprime mortgage related assets and CDOs would eventually be written-down by billions of dollars; and

(c)    as a result of the foregoing, Bear Stearns' reported earnings and business prospects were inaccurate.

## THE IMPROPER BUYBACK

70.    During the Relevant Period, while Bear Stearns' stock was artificially inflated due to the improper statements described above, the Director Defendants authorized the buyback of over $2.6 billion worth of Bear Stearns' shares at an average price of approximately $139.22 per share, which is substantially higher than Bear Stearns' current share price of less than $80 per share and comparable to the $161.92 per share the defendants averaged in selling their own Bear Stearns stock holdings during the Relevant Period.  On information and belief, in authorizing the buyback, the Board members failed to properly discuss and consider the Company's exposure to the subprime mortgage lending crisis.  While Bear Stearns was repurchasing these shares, the Insider Selling Defendants made the sales described herein.

## DAMAGES TO BEAR STEARNS CAUSED BY THE INDIVIDUAL DEFENDANTS

71.    As a result of the Individual Defendants' improprieties, Bear Stearns disseminated improper statements concerning its business prospects as alleged above.  These improper statements have devastated Bear Stearns' credibility as reflected by the Company's $10.3 billion market capitalization loss.

72.    Further, as a direct and proximate result of the Individual Defendants' action, Bear Stearns has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to Bear Stearns;

(b)    costs incurred from the $2.6 billion that Bear Stearns spent repurchasing its own stock;

(c)    costs incurred in defending Bear Stearns in lawsuits filed in connection with the collapse of the Company's two hedge funds during July 2007;

(d)    costs incurred in connection with governmental investigations of the collapse of the two hedge funds;

(e)    costs incurred in connection with the collapse of a third hedge fund announced on or about January 9, 2008; and

(f)    costs incurred in connection with massive lay-offs including severance costs, which totaled over $100 million during Bear Stearns' fiscal fourth quarter 2007.

73.    Moreover, these actions have irreparably damaged Bear Stearns' corporate image and goodwill. For at least the foreseeable future, Bear Stearns will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Bear Stearns' ability to raise equity capital or debt on favorable terms in the future is now impaired.

## INSIDER SELLING

74.    The Insider Selling Defendants, because of their positions, knew that the statements the Company publicly made were incorrect. They also knew that the misstatements would create an inflated stock price. The Insider Selling Defendants took advantage of this undisclosed information to sell their personally held stock for considerably more than they were worth. Therefore, while in possession of undisclosed material adverse information, the Insider Selling Defendants sold the following shares of Bear Stearns' stock:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| CAYNE | 12/18/2006 | 46,415 | $164.72 | $7,645,478.80 |
| | | 46,415 | | $7,645,478.80 |
| | | | | |
| FARBER | 7/28/2006 | 1,000 | $138.15 | $138,150.00 |
| | 12/18/2006 | 881 | $164.68 | $145,083.08 |
| | | 1,881 | | $283,233.08 |
| | | | | |
| GLICKMAN | 12/5/2007 | 3,427 | $92.52 | $317,066.04 |
| | | 3,427 | | $317,066.04 |
| | | | | |
| GREENBERG | 11/30/2006 | 21,295 | $143.48 | $3,055,406.60 |
| | 12/18/2006 | 5,768 | $164.68 | $949,874.24 |
| | 1/3/2007 | 150,396 | $163.11 | $24,531,091.56 |
| | 3/22/2007 | 1,818 | $151.26 | $274,990.68 |
| | | 179,277 | | $28,811,363.08 |
| | | | | |

| HARRINGTON | 1/17/2007 | 1,000 | $171.45 | $171,450.00 |
|---|---|---|---|---|
| | | **1,000** | | **$171,450.00** |
| | | | | |
| MINIKES | 12/18/2006 | 19,274 | $164.72 | $3,174,813.28 |
| | 3/22/2007 | 1,295 | $151.26 | $195,881.70 |
| | | **20,569** | | **$3,370,694.98** |
| | | | | |
| MOLINARO | 12/18/2006 | 9,344 | $164.68 | $1,538,769.92 |
| | 3/22/2007 | 1,482 | $151.26 | $224,167.32 |
| | | **10,826** | | **$1,762,937.24** |
| | | | | |
| SCHWARTZ | 12/18/2006 | 21,833 | $164.72 | $3,596,331.76 |
| | 3/22/2007 | 1,500 | $151.26 | $226,890.00 |
| | | **23,333** | | **$3,823,221.76** |
| | | | | |
| SPECTOR | 12/18/2006 | 44,096 | $164.68 | $7,261,729.28 |
| | 12/21/2006 | 69,197 | $164.12 | $11,356,611.64 |
| | 3/22/2007 | 2,962 | $151.26 | $448,032.12 |
| | | **116,255** | | **$19,066,373.04** |
| | | | | |
| **Total:** | | **402,983** | | **$65,251,818.02** |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

75.    Plaintiff brings this action derivatively in the right and for the benefit of Bear Stearns to redress injuries suffered, and to be suffered, by Bear Stearns as a direct result of breaches of fiduciary duty, waste of corporate assets, unjust enrichment and violations of the Exchange Act, as well as the aiding and abetting thereof, by Individual Defendants. Bear Stearns is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

76.    Plaintiff will adequately and fairly represent the interests of Bear Stearns in enforcing and prosecuting its rights.

77.    Plaintiff is and was an owner of the stock of Bear Stearns during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

78.    The current Board of Bear Stearns consists of the following twelve individuals: defendants Greenberg, Schwartz, Cayne, Glickman, Harrington, Salerno, Nickell, Tese, Novelly, Bienen, Williams and Goldstein.

79.    Defendants Greenberg, Schwartz, Cayne, Glickman, Harrington, Salerno, Nickell, Tese, Novelly, Bienen, Williams and Goldstein, as members of the Board during the Relevant Period, authorized the repurchases of over $2.6 billion worth of the Company's shares at artificially inflated prices. Bear Stearns repurchased these shares under two stock repurchase programs that the Board authorized during December 2005 and December 2006. The Board's decisions to authorize the stock repurchases were not the product of valid business judgment. Among other things, the Board failed to properly discuss or consider Bear Stearns' exposure to the subprime mortgage crisis. Further, defendants Greenberg, Schwartz, Cayne, Glickman and Harrington engaged in self-dealing in that they sold their personally held shares while directing the Company to buy shares. Accordingly, demand is futile.

80.    As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse, non-public information regarding Bear Stearns' true business prospects. While in possession of this material, adverse, non-public information regarding the Company, the following current members of the Bear Stearns Board participated in the illegal insider selling by selling the following amounts:

(a)    while in possession of adverse, non-public information, Greenberg sold 179,277 shares of Bear Stearns stock for proceeds of $28,811,363.08;

(b)    while in possession of adverse, non-public information, Cayne sold 46,415 shares of Bear Stearns stock for proceeds of $7,645,478.80;

(c)    while in possession of adverse, non-public information, Schwartz sold 23,333 shares of Bear Stearns stock for proceeds of $3,823,221.76;

(d)    while in possession of adverse, non-public information, Glickman sold 3,427 shares of Bear Stearns stock for proceeds of $317,066.04; and

(e)    while in possession of adverse, non-public information, Harrington sold 1,000 shares of Bear Stearns stock for proceeds of $171,450.

Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested. Moreover, these defendants face a sufficiently

substantial threat of liability for breach of their fiduciary duties for insider selling. Since these directors have breached their fiduciary duties and are interested, any demand upon them is futile.

81.    Defendants Nickell, Novelly, Salerno and Tese were, during the Relevant Period, members of the Finance and Risk Committee. The Finance and Risk Committee is responsible by its charter for: (i) reviewing and discussing with the Audit Committee Bear Stearns' policies and procedures regarding risk assessment and risk management of the Company's trading and investment risks; (ii) reviewing and discussing the risk measures and risk models utilized by the Company in evaluating and limiting financial risks; and (iii) reviewing and discussing with the Audit Committee significant risk exposures and trends. Thus, these defendants had a duty to know and accordingly did know that: (i) Bear Stearns faced exposure to the subprime mortgage crisis; and (ii) the Company's Relevant Period statements did not properly disclose that exposure. On information and belief, the Finance and Risk Committee reviewed and discussed Bear Stearns' exposures to the subprime crisis, which has been ongoing since at least mid-2006, during the course of its reviews and discussions of Bear Stearns' financial risks. Despite their knowledge of Bear Stearns' exposure to the subprime mortgage crisis, these defendants consciously disregarded their fiduciary duties owed to Bear Stearns by causing or allowing the improper statements alleged above. Accordingly, demand is futile as to defendants Nickell, Novelly, Salerno and Tese.

82.    Defendants Bienen, Glickman, Goldstein, Novelly, Salerno, Tese and Williams were, during the Relevant Period, members of the Audit Committee. The Audit Committee is responsible by its charter for: (i) reviewing and discussing earnings press releases; (ii) reviewing and discussing financial information and earnings guidance provided to analysts and rating agencies; and (iii) discussing with the Finance and Risk Committee Bear Stearns' policies regarding risk assessment and risk management, including Bear Stearns' major financial and credit risk and the steps management has taken to monitor and control such risks. Thus, these defendants had a duty to know and accordingly did know that: (i) Bear Stearns faced exposure to the subprime mortgage crisis; and (ii) the Company's Relevant Period statements did not properly disclose that exposure. On information and belief, the Audit Committee held discussions with the Finance and Risk Committee concerning Bear Stearns' exposure to the subprime crisis, which has been ongoing since at least mid-

2006. Despite their knowledge of Bear Stearns' exposure to the subprime mortgage crisis, these defendants consciously disregarded their fiduciary duties owed to Bear Stearns by causing or allowing the improper statements and earnings press releases alleged above. Thus, Bienen, Glickman, Goldstein, Novelly, Salerno, Tese and Williams face a sufficiently substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

83.    The principal professional occupation of Greenberg is his employment with Bear Stearns, pursuant to which he received and continues to receive substantial monetary compensation and other benefits. Specifically, Bear Stearns paid Greenberg the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $250,000 | $9,000,000 | $7,612,500 | 18,789 | $3,057,772 |
| 2005 | $200,000 | $7,274,154 | $5,665,819 | 32,026 | $2,183,559 |

Accordingly, Greenberg lacks independence from defendants Glickman, Harrington, Nickell and Tese, who are not disinterested and/or independent and who exert influence over Greenberg's compensation by virtue of their positions as members of the Compensation Committee. The Compensation Committee has the authority to review and approve Greenberg's base salary, bonus and equity compensation. This lack of independence renders defendant Greenberg incapable of impartially considering a demand to commence and vigorously prosecute this action.

84.    The principal professional occupation of Schwartz is his employment with Bear Stearns, pursuant to which he received and continues to receive substantial monetary compensation and other benefits. Specifically, Bear Stearns paid Schwartz the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $250,000 | $16,237,150 | $14,014,065 | 33,847 | $5,233,207 |
| 2005 | $200,000 | $12,072,654 | $9,744,544 | 53,650 | $4,487,164 |

Accordingly, Schwartz lacks independence from defendants Glickman, Harrington, Nickell and Tese, who are not disinterested and/or independent and who exert influence over Schwartz's compensation by virtue of their positions as members of the Compensation Committee. The Compensation Committee has the authority to review and approve Schwarz's base salary, bonus and

equity compensation.    This lack of independence renders defendant Schwartz incapable of impartially considering a demand to commence and vigorously prosecute this action.

85.    Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein.

86.    The Director Defendants of Bear Stearns, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Bear Stearns' stockholders or recklessly and/or negligently disregarded the wrongs complained of herein and are therefore not disinterested parties.

87.    The acts complained of constitute violations of fiduciary duties owed by Bear Stearns' officers and directors and these acts are incapable of ratification.

88.    Each of the Director Defendants of Bear Stearns authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

89.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek recovery for Bear Stearns for any of the wrongdoing alleged by plaintiff herein.

90.    Plaintiff has not made any demand on shareholders of Bear Stearns to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    Bear Stearns is a publicly held company with over 115 million shares outstanding, and over thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

**Derivatively Against the Director Defendants and Defendant Molinaro for Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

91.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

92.    During the Relevant Period, the Director Defendants and defendant Molinaro disseminated or approved public statements that improperly portrayed Bear Stearns' business prospects, growth and margins. The Director Defendants and defendant Molinaro knew that the Company's public statements concerning its business prospects were misleading and intended to deceive, manipulate and/or defraud in connection therewith.

93.    The Insider Selling Defendants also sold over $65 million worth of shares of Bear Stearns' common stock at inflated prices during the Relevant Period while in possession of material non-public information. These defendants misappropriated Bear Stearns' proprietary information and violated their so-called "abstain or disclose" duties under the federal securities laws when they sold Bear Stearns stock without disclosing the information alleged to have been concealed herein.

94.    At the same time the price of the Company's common stock was inflated due to the improper reporting of the value of Bear Stearns' business prospects, especially concerning the Company's exposure to the subprime mortgage market crisis, and the Insider Selling Defendants were selling stock into the market, the Director Defendants and defendant Molinaro were causing Bear Stearns to repurchase over $2.6 billion worth of its own stock on the open market at an average inflated price of approximately $139.22 per share, which is substantially higher than Bear Stearns' current share price of under $80 per share.

95.    As such, the Director Defendants and defendant Molinaro violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or

-33-

deceit upon Bear Stearns and others in connection with their purchases of Bear Stearns common stock during the Relevant Period.

96.    As a result of the Director Defendants' and defendant Molinaro's misconduct, Bear Stearns has and will suffer damages in that it paid artificially inflated prices for Bear Stearns common stock purchased on the open market. Bear Stearns would not have purchased Bear Stearns common stock at the prices it paid, had the market previously been aware that the market price of Bear Stearns' stock was artificially and falsely inflated by defendants' misleading statements. As a direct and proximate result of these defendants' wrongful conduct, Bear Stearns suffered damages in connection with its purchases of Bear Stearns common stock during the Relevant Period. By reason of such conduct, the Director Defendants and defendant Molinaro are liable to the Company pursuant to §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

97.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

98.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Bear Stearns common stock on the basis of such information.

99.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Bear Stearns common stock.

100.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated. The Insider Selling Defendants' sales of Bear Stearns common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

101.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT III

### Against All Defendants for Breach of Fiduciary Duty

102.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

103.    The Individual Defendants owed and owe Bear Stearns fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Bear Stearns the highest obligation of good faith, fair dealing, loyalty and due care.

104.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

105.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the Company's business prospects and financial results. The Individual Defendants also had actual or constructive knowledge that they were improperly causing Bear Stearns to repurchase over $2.6 billion of its own stock at artificially inflated prices. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

106.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Bear Stearns has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

107.    Plaintiff, on behalf of Bear Stearns, has no adequate remedy at law.

## COUNT IV

### Against All Defendants for Breach of Fiduciary Duty for Abuse of Control

108.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

109.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Bear Stearns, for which they are legally responsible. In particular, the

-35-

Individual Defendants abused their positions of authority by causing or allowing Bear Stearns to issue statements that improperly portrayed Bear Stearns' business prospects.

110.    As a direct and proximate result of the Individual Defendants' abuse of control, Bear Stearns has sustained significant damages. These damages include, but are not limited to, Bear Stearns' severe loss of market credibility as reflected in its $10.3 billion market capitalization loss and $2.6 billion paid to repurchase the Company's stock.

111.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

112.    Plaintiff, on behalf of Bear Stearns, has no adequate remedy at law.

## COUNT V

### Against All Defendants for Breach of Fiduciary Duty for Gross Mismanagement

113.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

114.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Bear Stearns in a manner consistent with the operations of a publicly held corporation.

115.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Bear Stearns has sustained significant damages in excess of hundreds of millions of dollars.

116.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

117.    Plaintiff, on behalf of Bear Stearns, has no adequate remedy at law.

## COUNT VI

### Against All Defendants for Waste of Corporate Assets

118.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

119.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, paying $2.6 billion to repurchase the Company' stock and paying bonuses to certain of its executive officers.

120.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

121.    Plaintiff, on behalf of Bear Stearns, has no adequate remedy at law.

### COUNT VII

### Against All Defendants for Unjust Enrichment

122.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

123.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Bear Stearns.

124.    Plaintiff, as a shareholder and representative of Bear Stearns, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets and unjust enrichment;

B.    Declaring that the Director Defendants and defendant Molinaro are liable under of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and awarding Bear Stearns damages;

C.    Directing Bear Stearns to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Bear Stearns and its shareholders from a repeat of the damaging events described herein, including, but

not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.     a provision to permit the shareholders of Bear Stearns to nominate at least three candidates for election to the Board;

3.     a proposal to ensure the accuracy of the qualifications of Bear Stearns' directors, executives and other employees;

4.     a proposal to control insider selling;

5.     a proposal to ensure that Bear Stearns prudently expends funds in stock repurchase programs;

6.     a proposal to better manage and disclose Bear Stearns' credit risks; and

7.     appropriately test and then strengthen the internal audit and control functions.

D.     Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting defendants' assets so as to assure that plaintiff on behalf of Bear Stearns has an effective remedy;

E.     Awarding to Bear Stearns restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

F.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: January 23, 2008

LAW OFFICES OF THOMAS G. AMON

THOMAS G. AMON (TGA-1515)

250 West 57th Street, Suite 1316
New York, New York 10107
Telephone: (212) 810-2430
Facsimile: (212) 810-2427

ROBBINS UMEDA & FINK, LLP
JEFFREY P. FINK
GEORGE C. AGUILAR
SHANE P. SANDERS
JILL E. KLEMANN
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Plaintiff

313642_4.DOC

## VERIFICATION

I, Louis A. Kerkhoff, hereby declare as follows:

1.       I am a member of the law firm of Robbins Umeda & Fink, LLP, counsel for plaintiff in The Bear Stearns Companies, Inc. action. I have read the foregoing complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.       I make this Verification because plaintiff is absent from the County of San Diego where I maintain my office.

Executed this 23rd day of January, 2008, at San Diego, California

_____
LOUIS A. KERKHOFF